IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF OKLAHOMA

SUSAN C. WILLARD, D.O.,            )
                                   )
          Plaintiff,               )
                                   )
-vs-                               ) No. 16-CV-677-GKF-JFJ
                                   )
AHS OKLAHOMA PHYSICIAN GROUP, LLC  )
d/b/a UTICA PARK CLINIC,           )
                                   )
          Defendant.               )

VOLUME I

TRANSCRIPT OF JURY TRIAL TESTIMONY OF TERRY WESTEMEIR

**BEFORE THE HONORABLE GREGORY K. FRIZZELL**

UNITED STATES DISTRICT JUDGE

FEBRUARY 22, 2018

REPORTED BY:      BRIAN P. NEIL, RMR-CRR
                  United States Court Reporter

1                    *A P P E A R A N C E S*

2

3          **Michael L. Barkett and Cassie M. Barkett,** Attorneys at
     Law, Barkett Law Firm, 1408 South Harvard Avenue, Tulsa,
4    Oklahoma, 74112, attorneys on behalf of the Plaintiff;

5
           **Patrick F. Clark and Amy E. Jensen,** Attorneys at Law,
6    Ogletree, Deakins, Nash, Smoak & Stewart, 191 Peachtree Street
     N.E., Suite 4800, Atlanta, Georgia, 30303, attorneys on behalf
7    of the Defendant;

8          **Steven L. Freije,** Attorney at Law, Latham, Wagner,
     Steele & Lehman, 10441 South Regal Boulevard, Suite 200, Tulsa,
9    Oklahoma, 74133, attorney on behalf of the Defendant.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          *I N D E X*

2

3                          *WITNESSES*

4                                                        *PAGE*

5    TERRY WESTEMEIR

6       Direct Examination by Mr. Barkett              4

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           Thursday, February 22, 2018

2                    * * * * *

3           THE COURT:  Mr. Barkett.

4           MR. BARKETT:  Yes.  Thank you, Your Honor.  The

5    plaintiff calls Mr. Terry Westemeir.

6                    *TERRY WESTEMEIR,*

7    *after having been first duly sworn, says in reply to the*

8    *questions propounded as follows, to-wit:*

9           THE COURT:  Sir, if you would state your full name,

10   please.

11          THE WITNESS:  My name is Terry Joe Westemeir.  Last

12   name is spelled W-e-s-t-e-m-e-i-r.

13          THE COURT:  Thank you, sir.  Mr. Barkett, you may

14   inquire.

15          MR. BARKETT:  Thank you.

16                 DIRECT EXAMINATION

17   BY MR. BARKETT:

18   Q.    Thank you, Mr. Westemeir.  Will you please tell the jury

19   a little bit about yourself, what you do, and why you're here?

20   A.    I'm a certified public accountant and I hold a bachelor's

21   and master's of accountancy degrees from the University of

22   Oklahoma.  I passed the exam in 1978 so I'm a CPA for almost 40

23   years now.  I hold the American Institute certifications in

24   forensic accounting and business valuation and I'm also a

25   certified fraud examiner.  I've been in practice in public

1  accounting.  I was with a law firm in Los Angeles for 17 years
2  and have been in practice here in Tulsa since returning in 1900
3  -- I mean, 2004.
4  Q.    Okay.  And, Mr. Westemeir, what brings the occasion to
5  have you here in court today?  Tell the jury.
6  A.    I'm testifying today on damages in the matter of
7  Ms. Willard.
8  Q.    Okay.  And you were retained by us to do that; right?
9  A.    I was retained by your law firm, yes, sir.
10 Q.    Okay.  And we pay you a fee to do that; correct?
11 A.    Correct.
12 Q.    Okay.  And you've been an expert before in cases; is that
13 true?
14 A.    I have.
15 Q.    Okay.  About how many times?
16 A.    I've testified -- well, being an expert in cases, I would
17 say, you know, around 100 times, I guess, and testified in
18 excess of 50 times.
19 Q.    Anything unusual about testifying as an expert from your
20 experience?
21 A.    No, not unusual.  It's just what I do.
22 Q.    All right.
23 A.    So it's not unusual for me, I guess.
24 Q.    And have you testified in age-discrimination cases
25 before?

1    A.    I have -- I have, yes, sir.

2    Q.    Okay.  Mr. Westemeir, as an expert, have you testified in

3    putting together economic damages models for a jury before?

4    A.    Yes, I have.

5    Q.    Okay.  And do you work for -- in this case, obviously

6    Dr. Willard is the plaintiff and then Utica Park Clinic is the

7    defendant.  Have you been retained by plaintiffs before?

8    A.    I have.

9    Q.    Okay.  Have you been retained by defendants before?

10   A.    I have.

11   Q.    Okay.  What's the breakdown percentage-wise?

12   A.    Percentage-wise defendants -- and with the law firm in

13   Los Angeles -- the defendants was 90 -- well, 75 to 90 percent

14   of my work has been for defendants.

15   Q.    All right.  So we asked you to take a look at the,

16   quote/unquote, damages in this particular age-discrimination

17   case; correct?

18   A.    Correct.

19   Q.    Okay.  And did you review materials in order to reach

20   conclusions in this case?

21   A.    I did.

22   Q.    Okay.  And could you tell us what you have reviewed as

23   the basis for presenting your opinion?

24   A.    I can give you, yeah, the broad categories from memory

25   here.  I did review the CV of Dr. Willard.  I did review some

1    of the filings in this case for age discrimination.  I did

2    review the tax returns for the Willards for 2010 through 2016.

3    I reviewed current financial statements on the practice of

4    Dr. Willard since 2016 and including 2016.  I reviewed -- and

5    in my research, I've reviewed different articles and -- about

6    age discrimination and making sure my calculations were current

7    with what was going on in courts around the country so I did a

8    survey of that.  And I reviewed other summaries of bank

9    statements, canceled checks of expenses incurred by the

10   Willards in this transition from the clinic to her own

11   practice.

12           I'd have to think about it some more or refer to my

13   report to --

14           **MR. BARKETT:**  Well, Your Honor, is it okay if he

15   refers to his report?

16           **THE COURT:**  Yes, sir.

17   Q.   **(BY MR. BARKETT)**  Yeah.  Go ahead.

18   A.   Okay.  As there was also e-mails I reviewed that were

19   produced in this case and with Bates numbers.  Oh, here's a

20   major one:  The employment agreement, the physician's

21   employment agreement, which was basic to this.

22   Q.   That's been admitted as Plaintiff's Exhibit 1 so far.

23   Okay.

24   A.   Okay.  And then, again, my research articles, Bureau of

25   Labor Statistics, the CV, and then some invoices, some

1    information about Dr. Willard's benefits while she was at

2    Hillcrest.  And that would -- that would fill out for the most

3    part what I looked at.  Oh, and then more recently the report

4    of the opposing expert.

5    Q.    Okay.  So the defendants have also hired an expert to

6    offer an opinion; correct?

7    A.    Correct.

8    Q.    Okay.  So the tax returns from 2010, 2011, 2012, 2013,

9    2014, 2015, and 2016, those were -- you reviewed those; right?

10   A.    Correct.

11          MR. BARKETT:  Your Honor, there's no objection to

12   those in the --

13          THE COURT:  Very well.  If there's no objection,

14   they are admitted.

15   Q.    (BY MR. BARKETT)  Okay.  And you also reviewed e-stubs of

16   Dr. Willard from her paychecks?

17   A.    Yes.  Paychecks and canceled checks, yes.

18   Q.    All right.  And Bureau of Labor Statistics research; is

19   that right?

20   A.    Correct.

21   Q.    You reviewed her CV, Dr. Susan Willard?

22   A.    Correct.

23   Q.    You reviewed a lease agreement between Winters Real

24   Estate and Dr. Susan Willard?

25   A.    I did.

1   Q.      Is that the lease where she offices now?

2   A.      Correct.

3   Q.      Okay.   You looked at the Ardent Health Systems savings

4   plan statement January 1, 2017, through March 31st of 2017?

5   A.      I did have that, yes, sir.

6   Q.      Okay.   And then you looked at a bill from Albright,

7   Rusher & Hardcastle?  I believe that's already been admitted in

8   this case as a bill of expenses for setting up her new

9   practice.

10  A.      Correct.

11          MR. BARKETT:   And, Your Honor, what I've just listed

12  is Plaintiff's Exhibit 67 through 71, and 72's already been

13  admitted.   There's no objection to 67 through 71.   Move to

14  admit.

15          THE COURT:   Just one second.

16          MR. BARKETT:   Yeah.

17          THE COURT:   67 through 71 are admitted.

18  Q.      (BY MR. BARKETT)   Okay.   Mr. Westemeir, I'm just looking

19  here to save time.   You reviewed a MassMutual policy loan

20  document?

21  A.      I did.

22          MR. BARKETT:   That's already been admitted.   That's

23  plaintiff's 73.

24  Q.      (BY MR. BARKETT)   Okay.   You said you reviewed canceled

25  checks from F & M Bank?

1    A.    Correct.

2    Q.    Whose checks were those and what was your purpose in

3    looking at those?

4    A.    They were Dr. Willard's, and it's the same as -- they

5    relate to the -- some of them relate to the Hardcastle invoices

6    you were -- I would characterize them all as expenses that she

7    incurred in setting up her own practice.

8    Q.    Okay.  Were those something that you relied upon in

9    coming to your conclusions as an expert in your field?

10   A.    They are.

11         MR. BARKETT:  All right.  Plaintiff would move to

12   admit Exhibit 74.

13         THE COURT:  Any objection?

14         MR. FREIJE:  No objection, Your Honor.

15         THE COURT:  Plaintiff's 74 is admitted.

16   Q.    (BY MR. BARKETT)  Okay.  And it looks like you looked at

17   some canceled checks from Bank SNB; is that right?

18   A.    Yes.  Again, both the F & M Bank, or Prosperity Bank, and

19   the SNB were in support of expenses related to Dr. Willard

20   opening up her account -- or her own practice.

21   Q.    And is that something that you utilized in reaching your

22   opinions as an expert in this matter?

23   A.    They were.

24         MR. BARKETT:  Those are Exhibit 75, Plaintiff's

25   Exhibit 75.  I move to admit those.

1          THE COURT:  Any objection?

2          MR. FREIJE:  No objection.

3          THE COURT:  Plaintiff's 75 is admitted.

4  Q.    (BY MR. BARKETT)  It looks like you reviewed financial

5  statements of Susan C. Willard as of and for the one-month and

6  six-month period ended June 30th, 2017; is that right?

7  A.    That is correct.

8  Q.    Okay.  Was that something that you considered in reaching

9  conclusions and opinions in this case as an expert?

10  A.    They are.

11  Q.    Okay.

12          MR. BARKETT:  I'd move to admit Plaintiff's 76.

13          MR. FREIJE:  No objection, Your Honor.

14          THE COURT:  Plaintiff's 76 is admitted.

15  Q.    (BY MR. BARKETT)  And you reviewed an earning history of

16  -- tell us about that.

17  A.    The earning history?  I'm not sure what you're referring

18  to there.

19  Q.    Well, it's listed -- I think it's Schedule 1 -- I'm

20  sorry.  That is Schedule 1 to your report.  When you made --

21  when you drafted your report, did you create spreadsheets that

22  illustrate your opinions?

23  A.    I did.

24  Q.    Okay.  We'll get to those later then.

25          Now, from your experience as an economic expert and

1  working on age-discrimination cases, can you tell the jury

2  typically in such a case what you look at?

3  **A.**    Yes.  I -- yes.  I look at historical earnings that have

4  been achieved while at the -- during the employment.  Then I

5  look at the -- of course, I look at the contract and the

6  agreement between the parties as to what was to be paid, but

7  then I look at actual earnings during the period and through

8  the point of the termination or discharge.  And then I project

9  out what that should have been, but for the termination or

10  discharge, and that drives my calculations --

11  **Q.**    Okay.

12  **A.**    -- of what I expect earnings to be.

13       Then the plaintiff in this case would be required to

14  mitigate damages, and that means she's not allowed to sit at

15  home, you know, eating bonbons, she's got to go out and

16  mitigate her damages and try to offset, or replace, that

17  earning stream.  So I look at that and that offset is accounted

18  for, and the delta, or the difference, the "but for" analysis,

19  yields an amount which I then opine on damages.

20  **Q.**    Okay.  Let me make sure it's clear in this case.

21       You're not offering an opinion at all about the

22  liability or the conduct of defendant; is that correct?

23  **A.**    That is correct.

24  **Q.**    Okay.  All you're offering to the jury today is what

25  Dr. Willard has incurred as damages under the Age

1    Discrimination in Employment Act, if they were liable?

2    **A.**    That is correct.

3    **Q.**    Okay.

4    **A.**    It's if and but for the actions.

5    **Q.**    Right.

6    **A.**    And those have to be proven.  You're exactly right.

7    **Q.**    Right.  Okay, Mr. Westemeir.  And in age-discrimination

8    cases, are there specific types of damages that you're familiar

9    with?

10   **A.**    Yes.

11   **Q.**    Can you tell us about those?

12   **A.**    There's -- there's two types of damages.  One is the back

13   pay, which is from the -- basically from the point of

14   termination to the point of trial.  So from this point going

15   back to the point she was terminated, that's a period of time

16   that we look and that's called "back pay period."

17           And then from the point of trial going forward to the

18   end of her contract or to retirement age is called "front pay."

19   Okay.  So you have back pay and front pay and then you can have

20   liquidated damages.

21   **Q.**    Okay.  And you're not here to opine on whether liquidated

22   damages are applicable in this case; is that correct?

23   **A.**    That is correct.

24   **Q.**    That's a separate decision for the jury to be made later;

25   right?

1    A.     That is correct.

2    Q.     Okay.  So have you -- with all of the information that

3    you stated that you provided in this case, were you able to

4    reach conclusions as an expert in your field based on your

5    experience, training, and education within a reasonable degree

6    of certainty as a professional?

7    A.     Yes, I was.

8    Q.     Okay.  And if you would, just tell the jury -- let's

9    start with the back pay damages -- how you calculated it and

10   what you came to.

11   A.     Right.  In the back pay, I first prepared a schedule that

12   -- and it's -- it's what Mr. Barkett referred to earlier as

13   earnings history and --

14   Q.     Let me find that.  That is Schedule 1?

15   A.     That's correct.

16   Q.     Okay.  If you would do us a favor -- and I know you've

17   got your report there -- but if you could turn to plaintiff's

18   exhibit book.

19   A.     Plaintiff's --

20              MR. BARKETT:  May I approach and assist the witness?

21              THE COURT:  You may.

22              MR. BARKETT:  Okay.

23   Q.     (BY MR. BARKETT)  All right, Mr. Westemeir.  If you could

24   flip to Plaintiff's Exhibit 77.

25   A.     Okay.  I'm there.

1   Q.    Are you there?  Is this the schedule that you're talking

2   about?

3   A.    It is.

4   Q.    And could you -- before we show it or ask for it to be

5   admitted, can you explain what Schedule 1 to your report shows?

6   A.    Yes.   Schedule 1 shows -- what I did is I summarized her

7   actually earnings from W-2s and tax returns from 2010 through

8   2015 received from -- first, it was Triad in 2010 but then

9   Broken Arrow Medical in 2011 and when she went to work at AHS

10  and then continuing on to get total wages per year.  Then I

11  added benefits and costs to that to get a total wages,

12  benefits, and costs schedule.

13  Q.    Okay.  And did you create this based on the information

14  that you were provided as an expert in your field?

15  A.    Yes, I did.

16  Q.    All right.

17        MR. BARKETT:  I'd move to admit Plaintiff's Exhibit

18  77, Schedule 1, to Mr. Westemeir's report.

19        THE COURT:  Any objection?

20        MR. FREIJE:  Your Honor, relevance and cumulative.

21        MR. BARKETT:  It's illustrative and assists the

22  jury.

23        THE COURT:  And just help me out here.  In terms of

24  earnings history --

25        MR. BARKETT:  Yes.

1    THE COURT:   -- its relevance?

2    MR. BARKETT:   Well, it's part of the foundation for

3    his ultimate opinions.  I just wanted him to be thorough and

4    show -- illustrate how he did it.

5    THE COURT:  Very well.  Plaintiff's 77 is admitted.

6    MR. BARKETT:  Can you show that?

7    Q.   (BY MR. BARKETT)  Okay.  Can you just explain to the jury

8    what we're looking at here?

9    A.   Yes.  In the top half of the page where it says "Triad,"

10   "Broken Arrow," and "AHS," in the columns 2010 through 2014 and

11   through '11, '14, '15, her last day of payment, salary was paid

12   at AHS, those are her actual earnings for her -- for her W-2s

13   and tax -- as reported on her tax returns also.

14   Q.   Okay.  And you looked at the actual W-2s from Utica Park

15   Clinic; is that right?

16   A.   I used the actual ones for all of those numbers, yes,

17   whether they were from Triad, Broken Arrow, or AHS.

18   Q.   Okay.  And I know the jury's heard in this case that

19   Dr. Willard had an annual salary of 297-5 but these numbers

20   seem to exceed that.  Is that because the value of benefits is

21   included?

22   A.   No.  That's because of her other items of income that

23   appear on her W-2.  I mean, that's -- that's as reported by

24   AHS.  That's the amounts she was actually paid.

25   Q.   All right.  And what else are we looking at here when you

1   say annualized and projected?

2   **A.**     Okay.  For the year 2015, as I said, she was only there

3   and paid through November 14th of '15, so I just did a simple

4   calculation of number of days to get an annualized 2015 that

5   indicates the amount that she would have been paid if she was

6   there the entire year.

7   **Q.**     Okay.

8   **A.**     And then in my projections going on out to '16, '17, '18,

9   and '19, what I did is I increased those at three percent a

10  year.

11  **Q.**     Okay.  And why three percent a year?

12  **A.**     Because that is, in today's times, a good crystal-ball

13  number, better than anything else, for average inflation rate

14  and risk-of-money rate in today's time.  It's pretty -- it's

15  been held around three now for several years, in fact, although

16  pressures seem to be recently to go a little higher than that.

17  But for this, I've used a three percent.

18  **Q.**     Okay.  And is that a reasonably accepted practice in your

19  field as an expert to project based on that kind of percentage?

20  **A.**     It's a conservative number.  You can see people use less

21  or more.  Some people might use a four, five percent, but on a

22  conservative basis I use three as my practice.

23  **Q.**     All right.  And then you utilized Schedule 1 to reach

24  your ultimate opinions; correct?

25  **A.**     It's -- it's one of the numbers I used, yes.

1    Q.     Okay.  If you could turn that exhibit book to page --

2    sorry -- Exhibit 78.

3    A.     Yes.

4    Q.     And this is identified as Schedule 2 to your report; is

5    that right?

6    A.     It is.

7    Q.     Can you tell us what that is?

8    A.     This is the mitigation calculation that I used -- or

9    actually a calculation I used to -- to calculate the mitigation

10   income that could be offset against what I thought her earnings

11   should be but for the termination.

12   Q.     All right.  That word, "mitigation," is kind of a weird

13   legalese type of thing.  Let's explain, if you could, what

14   "mitigation" kind of means, you know, so I understand it.

15   A.     Yeah.  It's an offset.  They -- like I said, the

16   expectation in damages cases that you're just not allowed to go

17   out and pursue damages but you've got to do something proactive

18   to reduce those damages.  You just can't sit at home, you've

19   got to go to work.

20          So these calculations is where I analyze her profits

21   and project out what profits she could make from -- from

22   running her own clinic and her salary.  And, you know, I deduct

23   out capital expenses, what it takes to buy equipment and so

24   forth, add back depreciation, noncash expense, to get what she

25   was making or what I project she would make by trying to reduce

1   damages.

2   Q.     Okay.  So, in other words -- tell me if I'm wrong -- you

3   make her projected calculated damages, but then you have to

4   subtract from that based on what she's expected to go out in

5   the workforce and do?

6   A.     On her own, yes.

7   Q.     On her own.  Okay.  And is that what Schedule 2

8   illustrates?

9   A.     That's what it illustrates, yes.

10  Q.     And as Schedule 2 is utilized, does it illustrate for

11  everyone and does it help to understand your ultimate

12  conclusions?

13  A.     It does, yes.

14          MR. BARKETT:  I'd move to admit Plaintiff's Exhibit

15  78.

16          THE COURT:  Any objection?

17          MR. FREIJE:  Just cumulative, Your Honor.

18          THE COURT:  Plaintiff's 78 is admitted.

19  Q.     (BY MR. BARKETT)  So briefly, if you will, just kind of

20  go over this and explain to the jury, if you would, what this

21  shows.

22  A.     Okay.  For 2015, the number is 17,785.  Now, that is the

23  losses that she incurred at the end of 2015 between that

24  period, November 14th, her last day of pay at AHS, to the end

25  of the year.  It's basically startup expenses for her work so

1   she incurred that much of a net loss.

2          Then in 2016, this is the net profit and loss from the

3   business, plus her salary, plus the depreciation expense, the

4   noncash expense, that came out of earnings, her capital

5   expenditures, and then I add the -- or subtract the personal

6   funds -- expenses paid from personal funds, and so that would

7   give me what she was able to make on her own for 2016.

8          And then I had information for 2017 for six months,

9   basically the same information, which I annualized.  Then I

10  picked -- I projected further on out to '18 and '19 so I could

11  match up what she -- what I expected her to earn over the

12  damages period to offset it against what I thought she would

13  have earned under the old contract but for the termination.

14  Q.     Okay.  Thank you.  If you could, take a look at

15  Plaintiff's Exhibit 79.  Are you with me?

16  A.     I am.

17  Q.     Okay.  What does Plaintiff's Exhibit 79 -- which is

18  titled Schedule 3 to your report; right?

19  A.     Right.

20  Q.     Okay.  What is contained in that schedule?

21  A.     That's where I bring it all together.  The earnings but

22  for the discriminatory acts is what I take and I show you year

23  by year, then I take -- I adjust for the mitigating earnings or

24  loss, and so I get to back pay and front pay damages numbers.

25  Q.     Okay.  And does this illustrate your ultimate conclusions

1   as an expert within a reasonable degree of medical -- medical

2   certainty -- within a reasonable degree of certainty as an

3   economic expert in your field?

4   **A.**    It does.

5   **Q.**    Okay.  And you've calculated Dr. Willard's back pay

6   damages?

7   **A.**    I have.

8   **Q.**    And you've calculated Dr. Willard's front pay damages?

9   **A.**    I did.

10  **Q.**    All right.  And is it included on this spreadsheet that

11  we've identified as Plaintiff's Exhibit 79?

12  **A.**    It does.

13           MR. BARKETT:  Okay.  I'd move to admit Plaintiff's

14  Exhibit 79.

15           THE COURT:  Any objection?

16           MR. FREIJE:  Just cumulative, Your Honor.

17           THE COURT:  Plaintiff's 79 is admitted.

18  **Q.**    **(BY MR. BARKETT)** All right, Mr. Westemeir.  Tell the

19  jury, if you would, the conclusion you reach with regard to

20  Dr. Willard's back pay and briefly and as simply as you can --

21  because I don't even get this stuff -- how you came to the

22  number.

23  **A.**    Okay.  How I came to the number is I've calculated the

24  earnings but for the termination --

25  **Q.**    And when you say "but for the termination," you mean if

1    it hadn't happened?

2    **A.**    That's correct.

3    **Q.**    Okay.

4    **A.**    Yeah.  I apologize.  "But for" is, you know, an

5    accounting term.  But this is what I project that earnings

6    would have been.

7    **Q.**    What was the -- what's the total number that you reached

8    as a conclusion for back pay?

9    **A.**    $683,850.41.

10   **Q.**    Okay.  Let me make sure I got that.  600 and --

11   **A.**    -- $83,850.41.

12   **Q.**    Okay.

13                    *(Discussion held off the record)*

14   **Q.**    **(BY MR. BARKETT)**  Okay.  It's highlighted on your

15   Schedule 3; right?

16   **A.**    It is.

17   **Q.**    Okay.  If you could just kind of run through how you came

18   to that number, tell the jury.

19   **A.**    Okay.  You'll see 2015.  Let's just take an example for

20   2015.  Got a little footnote A, which says it's for the period

21   November 15th of '15 through December 31st, '15, so it's only

22   for that part of the year after she quit there.  So her

23   earnings would have been for the rest of the year $62,459.60,

24   if you see that number.

25            And then in this case -- and this is the only year it

1   happened -- because of those startup expenses I actually --

2   they're additive, I added that to what she would have expected

3   to earn.  So for back pay for 2015 the number is $80,244.60.

4   Now, I'm not going to go through all the years but I'll take

5   you through '16.

6          Her earnings would have been -- and benefits would have

7   been $446,632.09, if you see that number.  Her mitigating, or

8   her earnings on her own, were $88,240, so I deduct that from

9   what they would have been and the net back pay for 2016 is

10  $358,391.82, if you follow that number.  So I did that for '17

11  and '18 through February 20th, which is the trial date, the

12  assumed trial date, to get to my --

13  Q.    Was that --

14  A.    Oh, sorry.

15  Q.    No.  Go ahead.  I'm sorry.

16  A.    -- to get to my totals for that period.  So it's really

17  from -- the total column is from November 15th, 2015, through

18  February 20th, 2018, of $1,035,329, less mitigation or income

19  she could have earned on her own of $351,479, to get to my back

20  pay number of $683,850.41.

21  Q.    Okay.  And I notice on here -- I mean, you're not

22  calculating this into infinity?

23  A.    No, sir.  It's just -- back pay is from the date of

24  termination to the trial date.

25  Q.    Right.  Okay.  And so ultimately the number that you came

1    to is $683,850.41 in back pay damages, including her

2    mitigation -- your mitigation reduction; correct?

3    **A.**    Correct.

4    **Q.**    Okay.  And did you calculate Dr. Willard's front pay

5    damages?

6    **A.**    I did.  And it's on the other part of the spreadsheet.

7    **Q.**    Tell us again what front pay represents.

8    **A.**    Front pay is from the date of trial to her expected

9    retirement date.

10    **Q.**    Okay.  I know you don't have a crystal ball but you do

11    have an education and experience in this field.  Can you kind

12    of tell us how you're able to come up with a front pay award?

13    **A.**    Yes.  It's basically staying with her employment and the

14    rate of pay she was receiving as an employee and then also

15    projecting out how much she was going to make as operating

16    separately.  It's still the net of the two.  We're just looking

17    at different time periods is all.

18    **Q.**    Okay.  And is that calculation you just described

19    something that is reasonably accepted in your profession as an

20    expert in this field?

21    **A.**    Yes, sir.

22    **Q.**    Okay.  And can you tell us your conclusion, the number

23    that you reach, as far as front pay damages for Dr. Willard in

24    this case?

25    **A.**    Yes.  $218,604.39.

1    Q.    Okay.  And then in simple terms, could you describe to

2    the jury how you came to that using this illustration?

3    A.    Yes.  In 2018 -- let's take that column and you can see

4    it's for footnote C which is for the period February 21, which

5    is the day after the assumed trial date was supposed to start

6    for February 21st, 2018, through December 31st, 2018.  So for

7    the rest of 2018, I expected she could have earned and benefits

8    $407,625.32, and her business would have earned $217,681.83

9    according to my projections.  So the difference netting the two

10    is for 2018 of $189,943.49.

11        I did the same for 2019 through her expected retirement

12    date of February 15th, 2019, and got another $28,660.96.  It's

13    just add those two together and that's my front pay damages.

14    Q.    Okay.  And is that number that you calculated a number

15    that was come up with using your expertise and reasonably

16    accepted standards in your field as applied to the facts of

17    this case?

18    A.    Yes, they were.

19    Q.    Okay.  And so I am terrible at math; that's why I got

20    into law.  What's the total of that?  And I don't have a

21    calculator.

22    A.    It looks like $902,454.80.

23    Q.    Okay.  And I'm going to see if I can get this thing to

24    work.  That would be $902,454.80.  That is the total amount of

25    damages you've calculated in this case that, under your

1    expertise, education, training, and reasonably accepted

2    standards in your field, you calculated as Dr. Willard's

3    damages in this case?

4    **A.**     Correct.

5    **Q.**     And that includes both the back pay portion and the front

6    pay portion?

7    **A.**     Correct.

8    **Q.**     Okay.  And you've got your report there in front of you.

9    Does your report outline and give an explanation in writing of

10   how you reach these calculations?

11   **A.**     Yes, it does.

12   **Q.**     And obviously you've summarized them here for us today;

13   do you agree?

14   **A.**     I do.

15   **Q.**     Okay.

16              **MR. BARKETT:**   Defendant have listed his report as an

17   exhibit in this case and there's been no objection in the

18   pretrial order.

19              **THE COURT:**   What number?

20              **MR. BARKETT:**   Defendant's 90.

21              **THE COURT:**   Defendant's 90?

22              **MR. BARKETT:**   Yes.

23              **THE COURT:**   All right.  Just one second.  Very well.

24              **MR. BARKETT:**   Move to admit.

25              **THE COURT:**   Without objection, Defendant's 90 is

1   admitted.

2           MR. BARKETT:   Your Honor, at this time we're over

3   5:00 and I have a new topic to get into with him that --

4           THE COURT:   This would be a good time to recess for

5   the evening.

6           MR. BARKETT:   Okay.

7           THE COURT:   Ladies and gentlemen, please don't

8   discuss the case amongst yourselves or with anyone else.   We'll

9   be back together at 9:00 a.m. tomorrow morning.   Thank you.

10                  *(The testimony was recessed)*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          *C E R T I F I C A T E*

2

3

4          I, Brian P. Neil, a Certified Court Reporter for the

5   Northern District of Oklahoma, do hereby certify that the

6   foregoing is a true and accurate transcription of my

7   stenographic notes and is a true record of the proceedings held

8   in above-captioned case.

9

10          I further certify that I am not employed by or related

11  to any party to this action by blood or marriage and that I am

12  in no way interested in the outcome of this matter.

13

14          In witness whereof, I have hereunto set my hand this

15  7th day of March 2018.

16

17

                              s/ Brian P. Neil
18                    _____

19                       *Brian P. Neil, RMR-CRR*
                         *United States Court Reporter*

20

21

22

23

24

25